GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
By:    EDWARD B. DISKANT
       BENET J. KEARNEY
       Assistant United States Attorneys
       One Saint Andrew's Plaza
       New York, New York 10007
       Tel. (212) 637-2294 / 2260

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                    :

                                            :

              -v.-                          :        **VERIFIED COMPLAINT**
                                            :        **FOR FORFEITURE**

$51,000,000 IN UNITED STATES CURRENCY,      :        20 Civ.

              Defendant-*in-rem*.           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

          Plaintiff United States of America, by its attorney Geoffrey S. Berman, United

States Attorney for the Southern District of New York, for its verified complaint, alleges, upon

information and belief, as follows:

## I.    JURISDICTION AND VENUE

          1.      This action is brought pursuant to Title 18, United States Code, Section 981

by the United States of America seeking the forfeiture of $51,000,000 in United States currency

(the "Defendant Funds" or the "defendant-*in-rem*").

          2.      This Court has jurisdiction pursuant to Title 28, United States Code, Section

1355.

          3.      Venue is proper under Title 28, United States Code, Section 1355(b)(1)(A)

because certain actions and omissions giving rise to forfeiture took place in the Southern District

of New York and pursuant to Title 28, United States Code, Section 1395 because the Defendant Funds have been transferred to the Southern District of New York.

4.      The Defendant Funds constitute proceeds of violations of the International Emergency Economic Powers Act ("IEEPA"), Title 50, United States Code, Section 1701 *et seq.*, and the regulations issued thereunder, and are thus subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C).

5.      Following the entry of a final order forfeiting the Defendant Funds to the United States, one half of the Defendant Funds shall be transferred to the United States Victims of State Sponsored Terrorism Fund pursuant to the Justice for United States Victims of State Sponsored Terrorism Act, Title 34, United States Code, Section 20144.

## II.      BACKGROUND

6.      In 2011, Kenneth Zong and others knowingly and willfully engaged in a scheme to violate U.S. economic sanctions relating to Iran, specifically the IEEPA and the Iranian Transactions and Sanctions Regulations ("ITSR"), by engaging in sham trade transactions and submitting fictitious documentation to Korean banks, including the Industrial Bank of Korea ("IBK"), in order to facilitate the transfer of Iranian funds from Korean won ("KRW")-denominated accounts belonging to the Central Bank of Iran (the "CBI Won Accounts") to Korean entities' accounts, the conversion of the funds into U.S. dollars ("USD"), and the subsequent transfer of USD from those entities through U.S. financial institutions to other accounts controlled by participants in the scheme.   In total, Zong initiated more than 88 transactions via IBK accounts (the "Zong Transactions"), thereby causing $1,004,662,911.57 worth of Iranian funds to be transferred from IBK's CBI Won Account through U.S. financial institutions to accounts

controlled by Zong and his co-conspirators and/or for the benefit of Zong and his co-conspirators, all in violation of U.S. sanctions laws.

7.     On or about April 20, 2020, IBK entered into a Deferred Prosecution Agreement (the "DPA") with the United States with respect to IBK's violation of the Currency and Foreign Transactions Reporting Act of 1970 (commonly known as the Bank Secrecy Act or "BSA"), Title 31, United States Code, Section 5311, *et seq.* (the DPA and the accompanying Statement of Facts are attached as Exhibit 1).   From at least in or about 2011, and continuing until at least in or about 2014, IBK and its New York branch ("IBKNY") violated United States law by willfully failing to establish, implement, and maintain an adequate anti-money laundering ("AML") program at IBKNY.   As set forth in greater detail in the Statement of Facts, despite requests and admonitions from regulators and IBKNY's own compliance officer, IBK and IBKNY failed to provide the resources, staffing, and training necessary to maintain an adequate AML program by declining to take steps to implement an automated transaction review program or to provide IBKNY's compliance officer with any support staff or assistance.   This failure permitted, among other things, the Zong Transactions to be processed through IBKNY and other U.S. financial institutions of in violation of IEEPA.   Under the DPA, IBK agreed to pay $51,000,000 to the United States, in addition to penalties paid to the New York State Department of Financial Services

### III.     THE DEFENDANT-IN-REM

8.     Pursuant and subject to the DPA, IBK transferred the Defendant Funds to the United States in the Southern District of New York as a substitute *res* for proceeds of Zong's offense that were transferred by IBK in connection with the conduct described in the Statement of

Facts.  IBK agrees that the Defendant Funds are subject to civil forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

## IV.  <u>CLAIM FOR FORFEITURE</u>

9.      Incorporated herein are the allegations contained in paragraphs one through eight of this Verified Complaint.

10.     Title 18, United States Code, Section 981(a)(1)(C) subjects to forfeiture "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specific unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense."

11.     "Specified unlawful activity" is defined in Title 18, United States Code, Section 1956(c)(7), and the term includes, among other things, violations of the International Emergency Economic Powers Act.

12.     By reason of the foregoing, the Defendant Funds are subject to forfeiture to the United States of America pursuant to Title 18, United States Code, Section 981(a)(1)(C), because the Defendant Funds constitute proceeds of violations of IEEPA.

WHEREFORE, plaintiff United States of America prays that process issue to enforce the forfeiture of the defendant-in-rem and that all persons having an interest in the defendant-in-rem be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the defendant-in-rem to the United States of America for disposition according to law, and that this Court grant plaintiff such further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: New York, New York
     April 20, 2020

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
Attorney for the Plaintiff
United States of America

By:     _____
EDWARD B. DISKANT
BENET J. KEARNEY
Assistant United States Attorneys
One Saint Andrew's Plaza
New York, New York 10007
Tel. (212) 637-2294 / 2260

**VERIFICATION**

STATE OF ALASKA                          )
COUNTY OF Anchorage District 3                    :
DISTRICT OF ALASKA                    )


       BENJAMIN R. MATTSON, pursuant to Title 28, United States Code, Section 1746, hereby declares under penalty of perjury that he is a Special Agent with the Federal Bureau of Investigation, and as such has responsibility for the within action; that he has read the foregoing complaint and knows the contents thereof, that the same is true to the best of his knowledge, information, and belief; and that the source of his information and the grounds of his belief are official records and files of the United States, information obtained directly by him, and information obtained by other law enforcement officials.

       Executed on April 20, 2020.

       BENJAMIN R. MATTSON
       Special Agent
       Federal Bureau of Investigation

6

EXHIBIT 1



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York New York 10007*

April 13, 2020

Carl H. Loewenson, Jr. Esq.
Barbara R. Mendelson, Esq.
Ruti Smithline, Esq.
Morrison & Foerster LLP
250 West 55th Street
New York, New York 10019

**Re: Industrial Bank of Korea – Deferred Prosecution Agreement**

Dear Mr. Loewenson, Ms. Mendelson, and Ms. Smithline:

Pursuant to the understandings specified below, the Office of the United States Attorney for the Southern District of New York (the "Office") and defendant Industrial Bank of Korea ("IBK"), under authority granted by its Board of Directors in the form of a Board Resolution (a copy of which is attached hereto as Exhibit A), hereby enter into this Deferred Prosecution Agreement (the "Agreement").

**The Criminal Information**

1.      IBK consents to the filing of a one-count Information (the "Information") in the United States District Court for the Southern District of New York (the "Court"), charging IBK with willfully failing to maintain an adequate anti-money laundering ("AML") program at its New York branch ("IBKNY"), in violation of Title 31, United States Code, Sections 5318(h), 5322(a), and 5322(c) and Title 31, Code of Federal Regulations, Section 1020.210.  A copy of the Information is attached hereto as Exhibit B.  This Agreement shall take effect upon its execution by both parties.

**Acceptance of Responsibility**

2.      IBK stipulates that the facts set forth in the Statement of Facts, attached hereto as Exhibit C and incorporated herein, are true and accurate, and admits, accepts and acknowledges that it is responsible under United States law for the acts of its current and former officers and employees as set forth in the Statement of Facts.  Should the Office pursue the prosecution that is deferred by this Agreement, IBK stipulates to the admissibility of the Statement of Facts in any proceeding including any trial and sentencing proceeding.

1

Carl H. Loewenson, Jr., Esq.
Barbara R. Mendelson, Esq.
Ruti Smithline, Esq.
April 13, 2020

## **Payments and Forfeiture Obligation**

3.     As a result of the conduct described in the Information and the Statement of Facts, IBK agrees to pay $51,000,000 to the United States (the "Stipulated Forfeiture Amount") pursuant to this Agreement. IBK has further agreed to pay a $35,000,000 penalty to the New York State Department of Financial Services ("DFS") in connection with its concurrent settlement of a related regulatory action (the "Consent Order").

4.     IBK agrees that the Stipulated Forfeiture Amount represents a substitute *res* for funds transferred by Kenneth Zong ("Zong") through IBK in connection with the conduct described in the Statement of Facts, and is subject to civil forfeiture to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 981(a)(1)(C).

5.     IBK further agrees that this Agreement, the Information and the Statement of Facts may be attached and incorporated into a civil forfeiture complaint (the "Civil Forfeiture Complaint") that will be filed against the Stipulated Forfeiture Amount.  By this agreement, IBK expressly waives any challenge to that Civil Forfeiture Complaint and consents to the forfeiture of the Stipulated Forfeiture Amount to the United States.  IBK agrees that it will not file a claim with the Court or otherwise contest the civil forfeiture of the Stipulated Forfeiture Amount and will not assist or direct a third party in asserting any claim to the Stipulated Forfeiture Amount.  IBK also waives all rights to service or notice of the Civil Forfeiture Complaint.

6.     IBK shall transfer the Stipulated Forfeiture Amount to the United States by no later than April 17, 2020 (or as otherwise directed by the Office following such date).  Such payment shall be made by wire transfer to the United States Marshals Service, pursuant to wire instructions provided by the Office.  IBK certifies that the funds used to pay the Stipulated Forfeiture Amount are not the subject of any lien, security agreement, or other encumbrance. Transferring encumbered funds or failing to pass clean title to these funds in any way will be considered a breach of this Agreement.

7.     IBK agrees that the Stipulated Forfeiture Amount shall be treated as a penalty paid to the United States government for all purposes, including all tax purposes.  IBK agrees that it will not claim, assert, or apply for a tax deduction or tax credit with regard to any federal, state, local, or foreign tax for any portion of the $51,000,000 that IBK has agreed to pay to the United States pursuant to this Agreement.

## **Obligation to Cooperate**

8.     IBK agrees to cooperate fully with the Office, the Federal Bureau of Investigation ("FBI"), the New York State Attorney General's Office (the "NYAG"), the Federal Reserve Bank of New York ("FRB-NY"), DFS, and any other governmental agency designated by the Office regarding any matter relating to the conduct described in the Information or Statement of Facts, or any matter relating to the fraudulent scheme perpetrated by Zong and the companies he owned and/or controlled.

Carl H. Loewenson, Jr., Esq.
Barbara R. Mendelson, Esq.
Ruti Smithline, Esq.
April 13, 2020

9.      It is understood that IBK shall (a) truthfully and completely disclose all information with respect to the activities of IBK and its affiliates, officers, agents, and employees concerning all matters about which the Office inquires of it, which information can be used for any purpose; (b) attend all meetings at which the Office requests its presence and use its reasonable best efforts to secure the attendance and truthful statements or testimony of any past or current officers, agents, or employees of IBK at any meeting or interview or before the grand jury or at trial or at any other court proceeding; (c) provide to the Office upon request any document, record, or other tangible evidence relating to matters about which the Office or any designated law enforcement agency inquires of it; (d) assemble, organize, and provide in a responsive and prompt fashion, and upon request, on an expedited schedule, all documents, records, information and other evidence in IBK's possession, custody or control as may be requested by the Office; (e) volunteer and provide to the Office any information and documents that come to IBK's attention that it understands may be relevant to the Office's investigation of this matter or any issue related to the Statement of Facts; (f) provide testimony or information necessary to identify or establish the original location, authenticity, or other basis for admission into evidence of documents or physical evidence in any criminal or other proceeding as requested by the Office, or any governmental agency designated by the Office; (g) bring to the Office's attention all criminal conduct by IBK or any of its agents or employees acting within the scope of their employment related to violations of the federal laws of the United States, as to which IBK's Board of Directors, senior management, or United States legal and compliance personnel are aware; (h) bring to the Office's attention any administrative, regulatory, civil or criminal proceeding or investigation of IBK or any agents or employees acting within the scope of their employment relating to United States sanctions or anti-money laundering laws; and (i) commit no crimes under the federal laws of the United States subsequent to the execution of this Agreement.

10.      Nothing in this Agreement shall be construed to require IBK to take any steps in violation of applicable law, including, but not limited to providing information, documents, or testimony (including interviews of any officer, employee, agent, consultant, or representative) that is prohibited from disclosure by Korean or other applicable laws, including data protection, bank secrecy, and other local confidentiality laws, or by the rules and regulations of banking regulators regarding the disclosure of confidential supervisory information.  Nor shall anything in this Agreement be construed to require IBK to provide information, documents, or testimony protected by the attorney-client privilege, work-product doctrine, or other applicable privileges.  To the extent that IBK believes that any materials it would otherwise be required to produce pursuant to this Agreement are covered by any such laws or privileges, IBK shall notify the Office of the existence and type of such materials.  At the request of the Office, IBK shall also provide (a) a log of all materials withheld on these grounds and (b) a written explanation of the operation and application of any law or privilege under which IBK concludes that it would be impermissible to produce the materials to the Office, and any methods or procedures by which production of such materials may be authorized. To the extent IBK believes that production of such materials would violate applicable laws or regulations, it shall use its best efforts to produce such materials, including by obtaining approval from the appropriate governmental agency or court to produce the materials, or by supporting an application made by the Office to the appropriate governmental agency or court, for production of the requested materials to the Office.

Carl H. Loewenson, Jr., Esq.
Barbara R. Mendelson, Esq.
Ruti Smithline, Esq.
April 13, 2020

11.     IBK agrees that its obligations pursuant to this Agreement, which shall commence upon the signing of this Agreement, will continue for two years from the date of the execution of this Agreement, unless otherwise extended pursuant to paragraph 16 below.  IBK's obligation to cooperate pursuant to this Agreement shall terminate in the event that a prosecution against IBK by this Office is pursued and not deferred.

## Deferral of Prosecution

12.     The Office agrees that the prosecution of IBK on the Information be deferred for two years from the date of the execution of the Agreement.  This decision reflects a variety of factors and considerations, including but not limited to IBK's acceptance and acknowledgement of responsibility under the laws of the United States for its conduct, as exhibited by its undertaking of a thorough internal investigation and transactional analysis, providing frequent and regular updates to the Office, collecting and producing evidence located in other countries to the full extent permitted under applicable laws and regulations, and making employees located in other countries available for interviews by this Office in the United States.  In reaching this decision, the Office also considered IBK's commitment to: (a) cooperate with the Office, FBI, the NYAG, the FRB-NY, DFS and any other law enforcement agency designated by this Office; (b) make the payments specified in paragraph 3 of this Agreement; (c) commit no future crimes under the federal laws of the United States (as provided herein in paragraph 9); and (d) otherwise comply with all of the terms of this Agreement.  All of the above factors and considerations, as well as others, collectively weighed in favor of deferral of prosecution in this case, and outweighed in this particular case, IBK's failure to self-report the full extent of its involvement in processing transactions that violated United States sanctions laws, failure to preserve certain electronic evidence relevant to those transactions, and failure to fully and promptly remediate the deficiencies in its compliance programs.  IBK shall expressly waive indictment and all rights to a speedy trial pursuant to the Sixth Amendment of the United States Constitution, Title 18, United States Code, Section 3161, Federal Rule of Criminal Procedure 48(b), and any applicable Local Rules of the United States District Court for the Southern District of New York for the period during which this Agreement is in effect.

13.     It is understood that this Office cannot, and does not, agree not to prosecute IBK for criminal tax violations.  However, if IBK fully complies with the terms of this Agreement, no testimony given or other information provided by IBK (or any other information directly or indirectly derived therefrom) will be used against IBK in any criminal tax prosecution.  In addition, the Office agrees that, if IBK is in compliance with all of its obligations under this Agreement, the Office will, within thirty (30) days after the expiration of the period of deferral (including any extensions thereof), seek dismissal with prejudice of the Information filed against IBK pursuant to this Agreement.  Except in the event of a violation by IBK of any term of this Agreement or as otherwise provided in paragraph 14, the Office will bring no additional charges against IBK or its subsidiaries, except for criminal tax violations, relating to conduct described in the Statement of Facts or otherwise disclosed to the Office during its investigation of this matter.  This Agreement does not provide any protection against prosecution for any crimes except as set forth above and does not apply to any individual or entity other than IBK and its subsidiaries.  IBK and the Office understand that the Agreement to defer prosecution of IBK can only operate as intended if the Court

Carl H. Loewenson, Jr., Esq.
Barbara R. Mendelson, Esq.
Ruti Smithline, Esq.
April 13, 2020

grants a waiver of the Speedy Trial Act pursuant to 18 U.S.C. § 3161(h)(2). Should the Court decline to do so, both the Office and IBK are released from any obligation imposed upon them by this Agreement, and this Agreement shall be null and void, except for the tolling provision set forth in paragraph 14.

14.     It is further understood that should the Office in its sole discretion determine that IBK has: (a) knowingly given false, incomplete or misleading information either during the term of this Agreement or in connection with the Office's investigation of the conduct described in the Information and Statement of Facts, (b) committed any crime under the federal laws of the United States subsequent to the execution of this Agreement, or (c) otherwise violated any provision of this Agreement, IBK shall, in the Office's sole discretion, thereafter be subject to prosecution for any federal criminal violation, or suit for any civil cause of action, of which the Office has knowledge, including but not limited to a prosecution or civil action based on the Information, the Statement of Facts, the conduct described therein, or perjury and obstruction of justice. Any such prosecution or civil action may be premised on any information provided by or on behalf of IBK to the Office, the FBI, the NYAG, the FRB-NY, or DFS at any time. In any such prosecution or civil action, it is understood that: (i) no charge or claim would be time-barred provided that such prosecution or civil action is brought within the applicable statute of limitations period (subject to any prior tolling agreements between the Office and IBK), excluding the period from the execution of this Agreement until its termination; (ii) IBK agrees to toll, and exclude from any calculation of time, the running of the applicable statute of limitations for the length of this Agreement starting from the date of the execution of this Agreement and including any extension of the period of deferral of prosecution pursuant to paragraph 16 below; and (iii) IBK waives any objection to venue with respect to any charges arising out of the conduct described in the Statement of Facts and consents to the filing of such charges in the Southern District of New York. By this Agreement, IBK expressly intends to and hereby does waive its rights in the foregoing respects, including the right to make a claim premised on the statute of limitations as set forth above, as well as any constitutional, statutory, or other claim concerning pre-indictment delay as set forth above. Such waivers are knowing, voluntary, and in express reliance on the advice of IBK's counsel.

15.     It is further agreed that in the event that the Office, in its sole discretion, determines that IBK has violated any provision of this Agreement, including by failure to meet its obligations under this Agreement: (a) IBK shall not object to the admissibility of all statements made or acknowledged by or on behalf of IBK to the Office, the FBI, the NYAG, the FRB-NY, or DFS including but not limited to the Statement of Facts, or any testimony given by IBK or by any agent of IBK before a grand jury, or elsewhere, whether before or after the date of this Agreement, or any leads from such statements or testimony, in any and all criminal proceedings hereinafter brought by the Office against IBK; and (b) IBK shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made or acknowledged by or on behalf of IBK before or after the date of this Agreement, or any leads derived therefrom, should be suppressed or otherwise excluded from evidence. It is the intent of this Agreement to waive any and all rights in the foregoing respects.

Carl H. Loewenson, Jr., Esq.
Barbara R. Mendelson, Esq.
Ruti Smithline, Esq.
April 13, 2020

      16.     IBK agrees that, in the event that the Office determines during the period of deferral of prosecution described in paragraph 12 above (or any extensions thereof) that IBK has violated any provision of this Agreement, an extension of the period of deferral of prosecution may be imposed in the sole discretion of the Office, up to an additional one year, but in no event shall the total term of the deferral-of-prosecution period of this Agreement exceed three (3) years.  Any extension of the deferral-of-prosecution period extends all terms of this Agreement for an equivalent period.  In the event the Office finds that there exists a change in circumstances sufficient to eliminate the need for the cooperation requirements set forth in paragraphs 8 and 9 above, and the reporting requirements in paragraphs 21 through 23 below, and that the other provisions of this Agreement have been satisfied, the Office may, in its sole discretion, choose to terminate IBK's obligations under the Agreement and seek dismissal with prejudice of the Information filed against IBK before the end of the period of deferral of prosecution described in paragraph 12.

      17.     IBK, having truthfully admitted to the facts in the Statement of Facts, agrees that it shall not, through its attorneys, agents, employees, or others authorized to speak on its behalf, make any statement, in litigation or otherwise, contradicting the Statement of Facts or this Agreement.  Consistent with this provision, IBK may raise defenses and/or assert affirmative claims in any proceedings brought by private and/or public parties as long as doing so does not contradict the Statement of Facts.  Any such contradictory statement by IBK, its present or future attorneys, agents, employees, or others authorized to speak on its behalf shall constitute a violation of this Agreement and IBK thereafter may be subject to prosecution as specified in paragraphs 14 through 15, above, or the deferral-of-prosecution period shall be extended pursuant to paragraph 16, above.  The decision as to whether any such contradictory statement will be imputed to IBK for the purpose of determining whether IBK has violated this Agreement shall be within the sole discretion of the Office. If the Office determines that a statement to any person outside of IBK by any such person contradicts a statement contained in the Statement of Facts, the Office shall so notify IBK.  Upon the Office's notifying IBK of any such contradictory statement, IBK may cure such a violation of this Agreement by repudiating such statement both to the recipient of such statement and to the Office within five business days after having been provided notice by the Office.  IBK consents to the public release by the Office, in its sole discretion, of any such repudiation.  Nothing in this Agreement affects the obligation of IBK or its officers, directors, agents or employees to testify truthfully in any investigation or proceeding.

      18.     IBK agrees that it is within the Office's sole discretion to choose, in the event of a violation, the remedies contained in paragraphs 14 and 15 above, or instead to choose to extend the period of deferral of prosecution pursuant to paragraph 16, provided, however, that if IBK's violation of this Agreement is limited to an untimely payment of the Stipulated Forfeiture Amount, the Office may elect instead to choose the additional payment of interest by IBK set forth in paragraph 6, above.  Should the Office determine that IBK has violated this Agreement, the Office shall provide written notice to IBK of that determination and provide IBK with an opportunity to make a presentation to the Office to demonstrate that no violation occurred, or, to the extent applicable, that the violation should not result in the exercise of any of those remedies, including because the violation has been cured by IBK.

Carl H. Loewenson, Jr., Esq.
Barbara R. Mendelson, Esq.
Ruti Smithline, Esq.
April 13, 2020

19.    IBK understands and agrees that the exercise of the Office's discretion under this Agreement, including the Office's determination regarding whether IBK has violated any provision of this Agreement and whether to pursue the remedies contained in paragraphs 15 and 16, is unreviewable by any court.

### The Bank's Compliance Programs

20.    IBK shall continue its ongoing effort to implement and maintain an adequate Bank Secrecy Act ("BSA")/AML compliance program at IBKNY in accordance with the BSA, its implementing regulations, and the directive and orders of any United States regulator of IBK, including without limitation the FRB-NY and DFS, including but not limited to the Written Agreement, dated February 24, 2016, by and among IBK, IBKNY, FRB-NY, and DFS (the "Written Agreement") and the Consent Order.  The Office acknowledges that, prior to the entry of this Agreement, IBK has implemented and is continuing to implement significant remedial changes to its BSA/AML compliance program.  It is understood that a violation of the BSA arising from conduct occurring prior to the date of execution of this Agreement will not constitute a breach of IBK's obligations pursuant to this Agreement.  However, there shall be no limitation on the ability of the Office to investigate or prosecute such violations and/or conduct in accordance with the applicable law and other terms of this Agreement including paragraph 13 thereof.

### Review of the Bank's Compliance Programs

21.    For the duration of the Agreement, IBK shall provide the Office with semi-annual reports in January and July of each year (the "Semi-Annual Reports") describing the status of IBK's implementation of any remedial changes to its Bank Secrecy Act/anti-money laundering compliance programs and compliance with the Office of Foreign Assets Control ("OFAC") regulations required by the Written Agreement and/or the Consent Order.  The Semi-Annual Reports shall identify any violations of the BSA or United States sanctions laws that have come to the attention of IBK's legal and compliance personnel during this reporting period. IBK further agrees that any compliance consultant or monitor imposed by any U.S. Federal or State regulator of IBK shall, at IBK's own expense, submit to the Office any report that it submits to that regulator. In the event the Office finds that there exists a change in circumstances sufficient to eliminate the need for any portion of the reporting requirements set forth in this paragraph, the Office may, in its sole discretion, choose to suspend or terminate those requirements in whole or in part.

22.    For the duration of this Agreement, the Office, as it deems necessary and upon request to IBK, shall: (a) be provided by IBK with access to any and all non-privileged books, records, accounts, correspondence, files, and any and all other documents or other electronic records, including e-mails, of IBK and its representatives, agents, affiliates that it controls, and employees, relating to any matters described or identified in the Semi-Annual Reports; and (b) have the right to interview any officer, employee, agent, consultant, or representative of IBK concerning any non-privileged matter described or identified in the Semi-Annual Reports.

23.    It is understood that IBK shall promptly notify the Office of (a) any deficiencies, failings, or matters requiring attention with respect to the Bank's BSA/AML

Carl H. Loewenson, Jr., Esq.
Barbara R. Mendelson, Esq.
Ruti Smithline, Esq.
April 13, 2020

compliance program identified by any U.S. Federal or State regulatory authority within 30 business days of any such regulatory notice; and (b) any steps taken or planned to be taken by IBK to address the identified deficiency, failing, or matter requiring attention.  The Office may, in its sole discretion, direct IBK to provide other reports about its compliance program as warranted.

## Limits of this Agreement

24.     It is understood that this Agreement is binding on the Office but does not bind any other Federal agencies, any state or local law enforcement agencies, any licensing authorities, or any regulatory authorities.  However, if requested by IBK or its attorneys, the Office will bring to the attention of any such agencies, including but not limited to any regulators, as applicable, this Agreement, the nature and quality of IBK's cooperation, and IBK's compliance with its obligations under this Agreement.

## Sale or Merger of IBK

25.     Except as may otherwise be agreed by the parties hereto in connection with a particular transaction, IBK agrees that in the event it sells, merges, or transfers all or substantially all of its business operations as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, or transfer, it shall include in any contract for sale, merger or transfer a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement.

## Public Filing

26.     IBK and the Office agree that, upon the submission of this Agreement (including the Statement of Facts and other attachments hereto) to the Court, this Agreement (and its attachments) shall be filed publicly with the Court.

27.     The parties understand that this Agreement reflects the unique facts of this case and is not intended as precedent for other cases.

## Execution in Counterparts

28.     This Agreement may be executed in one or more counterparts, each of which shall be considered effective as an original signature.  Further, all digital images of signatures shall be treated as originals for all purposes.

Carl H. Loewenson, Jr., Esq.
Barbara R. Mendelson, Esq.
Ruti Smithline, Esq.
April 13, 2020

## Integration Clause

29.    This Agreement sets forth all the terms of the Deferred Prosecution
Agreement between IBK and the Office.  No modifications or additions to this Agreement shall
be valid unless they are in writing and signed by the Office, IBK's attorneys, and a duly
authorized representative of IBK.

GEOFFREY S. BERMAN
United States Attorney
Southern District of New York

By: _____
Edward B. Diskant
Benet J. Kearney
Assistant United States Attorneys

_____
Laura Birger
Chief, Criminal Division

Accepted and agreed to:

_____
Seong Hwan Ko
General Manager, IBKNY

April 20, 2020
Date

_____
Carl H. Loewenson, Jr., Esq.
Barbara R. Mendelson, Esq.
Ruti Smithline, Esq.
Morrison & Foerster LLP
Attorneys for Industrial Bank of Korea

April 20, 2020
Date

9

EXHIBIT A

# ■ 의안 결의서

위와 같이 相違없음을 認定함.

### 제18호 한·이란 원화결제계좌 관련 美 검찰 등과의 조사 진행경과 및 협상결과 승인(안)

| 職 | 姓 名 | 署 名 | 可·否 | 職 | 姓 名 | 署 名 | 可·否 |
|---|---|---|---|---|---|---|---|
| 銀 行 長 (議 長) | 尹 琮 源 |  | 可·否 | 專務理事 | 金 成 泰 |  | 可·否 |
| 理　　事 | 金 政 壎 |  | 可·否 | 理　　事 | 李 承 栽 |  | 可·否 |
| 理　　事 | 辛 忠 植 |  | 可·否 | 理　　事 | 金 世 稙 |  | 可·否 |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |

| 監　　事 | 任 宗 聲 |  |
|---|---|---|

■ Agenda Resolution

It is acknowledged that this is accurate as above.

**Item 18    (Proposed) Authorization of the Investigation Status and Negotiation Results Regarding the Investigation by US Prosecutors, etc. related to the Korea – Iran Korean Won Denominated Settlement Account**

| Position | Name | Signature | Approve / Disapprove | Position | Name | Signature | Approve / Disapprove |
|---|---|---|---|---|---|---|---|
| CEO (Chairman) | Jong-Won YOON | (signature) | Approve / Disapprove | Executive Vice President | Sung-Tae KIM | (signature) | Approve / Disapprove |
| Director | Jung-Hoon KIM | (signature) | Approve / Disapprove | Director | Seung-Jae LEE | (signature) | Approve / Disapprove |
| Director | Chung-Shik SHIN | (signature) | Approve / Disapprove | Director | Se-Jik KIM | (signature) | Approve / Disapprove |

| Auditor | Jong-Sung LIM | (signature) |
|---|---|---|

EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - X
                          :      **INFORMATION**

UNITED STATES OF AMERICA      :      20 Cr.

                          :

      - v. -                  :

INDUSTRIAL BANK OF KOREA,      :

            Defendant.      :

- - - - - - - - - - - - - - - - - - - - X

**COUNT ONE**

**(Willful Failure to Maintain an Adequate Anti-Money Laundering Program in Violation of the Bank Secrecy Act)**

     The United States Attorney charges:

     1.    From at least in or about 2011 through in or about 2014, in the Southern District of New York and elsewhere, INDUSTRIAL BANK OF KOREA ("IBK"), the defendant, did willfully fail to establish, implement, and maintain an adequate anti-money laundering program, to wit, IBK did, among other things, willfully fail to provide staffing and resources for the anti-money laundering program at its New York branch ("IBKNY"), a financial institution within the meaning of Title 31, United States Code, Section 5312(a)(2)(D), which were necessary to

adequately monitor for suspicious transactions processed by

IBKNY.

(Title 31, United States Code, Sections 5318(h), 5322(a) and
(c);  Title 31, Code of Federal Regulations, Section 1020.210;
and Title 18, United States Code, Section 2)

GEOFFREY S. BERMAN
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

---

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**UNITED STATES OF AMERICA**

**- v. -**

**INDUSTRIAL BANK OF KOREA,**
**Defendant.**

---

**<u>INFORMATION</u>**

20 Cr.

(31 U.S.C. §§ 5318 and 5322;
31 C.F.R. § 1010.210;
18 U.S.C. § 2)

---

GEOFFREY S. BERMAN
United States Attorney.

---

EXHIBIT C

**INTRODUCTION**

1.      The following Statement of Facts is incorporated by reference as part of the

deferred prosecution agreement (the "Agreement") between the United States Attorney's Office

for the Southern District of New York (the "Office") and Industrial Bank of Korea ("IBK") and

the non-prosecution agreement between the New York State Office of the Attorney General

("NYAG") and IBK.

2.      The parties agree and stipulate that the information contained in this Statement of

Facts is true and accurate.

**OVERVIEW**

3.      IBK is a South Korean bank.  It has one United States branch, which is located in

New York ("IBKNY"), and which does not offer retail banking services.  Rather, IBKNY

provides various services to IBK and IBK's Korean customers and to a limited number of

IBKNY customers, including serving as a correspondent bank for transactions processed on

behalf of IBK's customers in Korea.

4.      From at least in or about 2011, and continuing until at least in or about 2014, IBK

and IBKNY violated United States law by willfully failing to establish, implement, and maintain

an adequate anti-money laundering ("AML") program at IBKNY.  Among other things, despite

requests and admonitions from regulators and IBKNY's own compliance officer, IBK and

IBKNY failed to provide the resources, staffing, and training necessary to maintain an adequate

AML program by declining to take steps to implement an automated transaction review program

or to provide IBKNY's compliance officer with any support staff or assistance.  This failure

permitted, among other things, the processing through IBKNY and other U.S. financial

institutions of approximately $1 billion in transactions on behalf of one or more IBK customers

that violated the International Emergency Economic Powers Act ("IEEPA"), Title 50, United States Code, Section 1701, *et seq.*

## THE BANK SECRECY ACT'S REQUIREMENTS

5.      The Currency and Foreign Transactions Reporting Act of 1970 (commonly known as the Bank Secrecy Act or BSA), Title 31, United States Code, Section 5311, *et seq.*, requires financial institutions – including IBKNY – to take certain steps to protect against their use to commit crimes and launder money.

6.      The BSA requires financial institutions to establish and maintain adequate AML compliance programs that, at a minimum and among other things, comprise the following: (a) internal policies, procedures, and controls designed to guard against money laundering; (b) an individual or individuals to coordinate and monitor day-to-day compliance with BSA and AML requirements; (c) an ongoing employee training program; and (d) an independent audit function to test compliance programs.  31 U.S.C. § 5318(h).

7.      In order to be adequate, a bank's AML compliance program must be risk-based and its systems for identifying suspicious activity must be tailored to the bank's risk profile.  The bank must assign adequate staff to the identification, evaluation, and reporting of potentially suspicious activities, taking into account the bank's overall risk profile and the volume of transactions.  The BSA imposes separate requirements on financial institutions, such as IBKNY, that maintain correspondent bank accounts.  Specifically, "[e]ach financial institution that establishes, maintains, administers, or manages a . . . correspondent account in the United States . . . shall establish appropriate, specific, and, where necessary, enhanced, due diligence policies, procedures, and controls that are reasonably designed to detect and report instances of money laundering through those accounts."  31 U.S.C. § 5318(i)(1).

8.      The BSA and regulations thereunder require financial institutions to report "suspicious transaction[s] relevant to a possible violation of law or regulation."  31 U.S.C. § 5318(g)(1); 31 C.F.R. § 1020.320(a)(1).  BSA regulations provide that a transaction is reportable if it is "conducted or attempted by, at, or through the bank," "involves or aggregates at least $5,000 in funds or other assets," and "the bank knows, suspects, or has reason to suspect that . . . [t]he transaction involves funds derived from illegal activities or is intended or conducted in order to hide or disguise funds or assets derived from illegal activities (including, without limitation, the ownership, nature, source, location, or control of such funds or assets) as part of a plan to violate or evade any Federal law or regulation" or that the "transaction has no business or apparent lawful purpose."  31 C.F.R. § 1020.320(a)(2).  Financial institutions satisfy their obligation to report such a transaction by filing a suspicious activity report ("SAR") with the Financial Crimes Enforcement Network ("FinCEN"), a part of the United States Department of the Treasury.  31 C.F.R. § 1020.320(b).

### IBKNY'S FAILURE TO MAINTAIN AN ADEQUATE AML PROGRAM

9.      At all relevant times, IBKNY's compliance officer (the "Compliance Officer") was responsible for IBKNY's fulfilment of its obligations under the BSA.  The Compliance Officer was hired by, and reported to, IBKNY's branch manager, who in turn reported to IBK's main office in South Korea (the "Head Office").  While the Compliance Officer had significant experience in the BSA/AML field, he was the only full-time compliance employee at IBKNY, and was not provided with any qualified or trained assistance, despite repeated and ongoing requests for additional staffing.  Nor was he provided with the tools, including an automated transaction screening program, necessary for him under the circumstances to adequately fulfill the bank's compliance function.  As a result, IBKNY fell months behind in its review of transactions, as required by the BSA, and was unable to identify and report illegal transactions in

a timely manner.

### A. IBKNY'S FAILURE TO IMPLEMENT AND MAINTAIN RISK-BASED SCREENING POLICIES

10.     From at least 2006, when the Compliance Officer started working at IBKNY, until approximately January 2013, when, as discussed below, IBKNY began implementing an automated system, IBKNY's process for reviewing transactions processed by the branch was manual.  By at least early 2010, both outside regulators and the Compliance Officer had come to view the manual review as insufficient and flagged the need to enhance the branch's transaction monitoring system with additional resources.  In particular, the New York State Banking Department ("NYSBD") (the predecessor agency of the New York State Department of Financial Services), in its 2010 examination of IBKNY, specifically cited deficiencies in IBKNY's manual transaction monitoring system, identifying them collectively as a "Matter Requiring Immediate Attention," and directed IBKNY to commit resources to ensure timely detection and reporting of suspicious activities.

11.     Similarly, in an internal memorandum in early 2010, the Compliance Officer alerted IBKNY management that the volume of transactions and "changing regulatory environment" made it difficult for the Compliance Officer to continue to manually review all inbound transactions in a timely fashion.  In that memorandum, the Compliance Officer described the lack of an automated screening system, particularly when combined with the dearth of compliance staff, as a "deficiency" and stated that the Compliance Officer had been "diligently working to both improve efficiency and achieve all Compliance requirements in a timely fashion" since starting at IBKNY in 2006.  Critically, the Compliance Officer further noted that "[a]s a consequence of this deficiency, Regulatory Agencies will have no choice but to find that IBKNY's management has not provided sufficient resources to compliance to maintain

an effective BSA program."

12.     Notwithstanding the recommendation to increase compliance resources, no action was taken by IBKNY's branch manager (the "Branch Manager") or anyone at IBK.  On May 28, 2010, the Compliance Officer followed up with a memo to the Branch Manager stating that IBK's existing systems "cannot provide IBKNY BSA/AML report automation" – that is, cannot support an automated transaction review system – "without considerable . . . system programming cost.  Therefore, I recommend that IBKNY senior management seek immediate approval from Head Office for IBKNY to identify, install and implement an existing regulatory accepted BSA vendor provided software solution."  The Compliance Officer also engaged in face-to-face conversations with the Branch Manager, which these written communications were intended to memorialize, during which the Compliance Officer emphasized the need to take swift action to mitigate risk to the compliance program.

13.     In January 2011, the Compliance Officer again wrote a memo to IBK's Compliance Committee, which included senior Head Office leadership.  That memo summarized the results of the NYSBD examination described above, and reiterated the Compliance Officer's own recommendation that IBK obtain a vendor to provide it with automated transaction review software, in light of the fact that the "current [manual review] process is manually intensive, excessively time consuming to complete and prone to error, thereby exposing IBKNY to significant Bank Regulatory Sanctions."  The memo also included a recommendation that IBKNY select a particular vendor to provide this service which the Compliance Officer had identified after reviewing three potential options toward the end of 2010.

14.     In the first quarter of 2011, IBKNY's internal auditor prepared a report that reiterated the NYSBD's finding that IBKNY's "Suspicious Activity Monitoring System [Was]

5

Not Effective," and added the auditor's recommendation that "[m]anagement should commit resources to remedy the deficiencies noted to ensure timely detection and reporting of suspicious activity."

### B. IBKNY'S FAILURE TO HAVE SUFFICIENT AML STAFFING

15.     In 2010 and 2011, the Compliance Officer was the only compliance employee at IBKNY.  In the same 2010 memo in which the Compliance Officer documented the deficiencies in the IBKNY transaction review program, the Compliance Officer also made "a formal request for one additional IBKNY professional compliance staff" member.  In response, IBKNY senior leadership, including the Branch Manager, first proposed assigning bank interns–who neither spoke English nor had any relevant compliance experience – to assist the Compliance Officer, who only spoke English.  When the Compliance Officer objected to that proposal, the Branch Manager instead assigned one of IBKNY's IT employees to assist the Compliance Officer on a part-time basis while still maintaining responsibility for IT work.  That employee, who similarly had limited English language ability, had no experience in compliance and was of limited use to the Compliance Officer.

16.     In March 2011, with no immediate progress being made on an automated screening system, the Compliance Officer wrote another memo to various IBKNY employees, including a deputy branch manager, with the subject: "BSA/AML Staffing."  In the memo, the Compliance Officer again highlighted the significant problems caused by the continued need to engage in manual review of all transactions, adding that he had fallen so far behind at that point that "it would take approximately six months to get caught up enough to meet regulatory expectations."  The Compliance Officer thus wrote that "it is *imperative* that IBKNY immediately recruit additional experienced AML/BSA resources" and recommended that, given

the delay in starting the automated review of transactions, IBKNY hire additional experienced BSA/AML staff.

17.    No meaningful action was taken on the Compliance Officer's request for additional personnel.  Rather, the Branch Manager agreed to authorize overtime for the Compliance Officer and the IT employee assisting him so that they could devote extra hours to the manual review process.  IBKNY did not obtain a second devoted compliance employee until after 2014, when it hired a part-time consultant.

18.    Due to the lack of an automated screening program and the lack of sufficient, adequately trained compliance staff to engage in the manual review process, the Compliance Officer fell months behind in his review of transactions being processed on behalf of IBK-Korea through IBKNY, reviews that are intended to be completed at or shortly after the time of the transactions themselves.  As a result, IBKNY did not detect or flag significant suspicious transactions that were processed through the branch until months after those transactions had been completed.

### C.   IBKNY'S INADEQUATE PROGRAM PERMITS MORE THAN $1 BILLION OF SANCTIONS-VIOLATING TRANSACTIONS TO BE PROCESSED BY IBK.

19.    Due to the inadequacies of IBKNY's AML program, IBKNY and IBK failed to promptly identify a series of transactions that violated the United States' economic sanctions against Iran.  As set forth further below, from January 2011 until July 2011, Kenneth Zong, an American citizen, and various primarily Iranian co-conspirators exploited bank accounts that had been established at IBK and at another bank to permit certain forms of trade between Korea-based entities and Iran, to unlawfully transfer U.S. Dollars ("USD") to Iranian-controlled entities.  IBKNY only reviewed and identified Zong's transactions as unlawful more than five

months after they began to be processed through IBK, after IBK had already processed more than $1 billion worth of such transactions.

*THE INTERNATIONAL EMERGENCY ECONOMIC POWERS ACT*

20.     U.S. law prohibits any U.S. person, including financial institutions inside the United States, from providing services directly or indirectly to Iran or the Government of Iran, in the absence of a license from the U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC").  This prohibition includes the unlicensed processing of transactions through U.S. banks that are for the benefit of the Government of Iran, including any agency or instrumentality of the Government of Iran or any entity owned or controlled by the Government of Iran.  The Central Bank of Iran ("CBI") is part of the Government of Iran and has been identified by OFAC as an entity owned or controlled by the Government of Iran since prior to 2000.

21.     Specifically, the IEEPA, codified at Title 50, United States Code, Sections 1701 to 1706, authorizes the President "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States" by declaring a national emergency with respect to such threats, 50 U.S.C. § 1701(a), and to take steps to address such threats, including the authority to "investigate, regulate, or prohibit . . . any transactions in foreign exchange," "transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof," and "the importing or exporting of currency or securities by any person, or with respect to any property, subject to the jurisdiction of the United States[,]" 50 U.S.C. § 1702(a)(1)(A).

22.     Beginning with Executive Order No. 12170, issued on November 14, 1979, the President found that "the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States and … declare[d] a national emergency to deal with that threat."  On March 15 and May 6, 1995, the President issued Executive Orders Nos. 12957 and 12959, prohibiting, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person, and on August 19, 1997, issued Executive Order No. 13059 clarifying the previous orders (collectively, the "Executive Orders").  The Executive Orders authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders.  Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations (renamed in 2013 the Iranian Transactions and Sanctions Regulations, or "ITSR") implementing the sanctions imposed by the Executive Orders.

23.     The ITSR, Title 31, Code of Federal Regulations, Section 560.204, prohibit, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, of goods, technology, or services to Iran or the Government of Iran (with certain limited exceptions), including the exportation, reexportation, sale or supply of goods, technology or services to a third country knowing that such goods, technology or services are intended for Iran or the Government of Iran, without a license from OFAC.  The ITSR provide that the transfer of funds, directly or indirectly, from the United States or by a U.S. person to Iran or the Government of Iran is a prohibited export, reexport, sale, or supply of services to Iran or the Government of Iran.  *See* 31 C.F.R. § 560.427(a).  The ITSR

further prohibit transactions that evade or avoid, have the purpose of evading or avoiding, cause a violation of, or attempt to violate the ITSR.  31 C.F.R. § 560.203.

## NEW YORK STATE LAW REGARDING FALSE BUSINESS RECORDS

24.     New York State Penal Law Sections 175.05 and 175.10 make it a crime to, "with intent to defraud,…1. [m]ake[] or cause[] a false entry in the business records of an enterprise [(defined in relevant part as any company or corporation)]…or 4. [p]revent[] the making of a true entry or cause [] the omission thereof in the business records of an enterprise."  It is a felony under Section 175.10 of the New York State Penal Law if a violation under Section 175.05 is committed and the person's or entity's "intent to defraud includes an intent to commit another crime or aid or conceal the commission thereof."

## THE CBI WON ACCOUNT

25.     In September 2010, following the enactment of The Comprehensive Iran Sanctions Accountability and Divestment Act of 2010 ("CISADA"), which, among other things, authorized the imposition of sanctions against foreign financial institutions that engaged in transactions either facilitating Iran's nuclear or ballistic missiles programs, or with persons and entities designated under United Nations and U.S. sanctions against terrorism and weapons of mass destruction proliferation, and following Korea's announcement of its own bilateral sanctions against Iran, the Korean government, in consultation with the United States Government, authorized IBK and another Korean bank to each establish a Korean won ("KRW")-denominated account belonging to CBI, *i.e.*, a CBI Won Account.  The purpose of these accounts was to permit limited forms of trade between Korea-based entities and Iran, including the import of Iranian oil to Korea.

26.     The CBI Won Accounts were subject to several limitations.  Among other things, the accounts could be used for transactions involving only certain, permissible types of goods, including crude oil exports from Iran.  All other transactions – including transactions for weapons — were specifically prohibited.  Additionally, transactions involving the CBI Won Account could not involve USD.

27.     Beginning in January 2011, Zong and others, including several Iranian nationals, engaged in a scheme to evade the IEEPA and ITSR, by using the CBI Won Account to convert Iranian KRW payments into USD (the "Zong Scheme").  In connection with the Zong Scheme, Zong and his co-conspirators set up shell companies in Korea, Iran, and elsewhere, which engaged in sham trade transactions and submitted fictitious documentation to Korean banks, including IBK, in order to facilitate the transfer of Iranian funds from the CBI Won Account to Korean entities' accounts, the conversion of the funds into USD, and the subsequent transfer of USD from those entities to other accounts controlled by participants in the Zong Scheme.

28.     In total, between February 10, 2011 and July 20, 2011, Zong initiated over 88 transactions via IBK accounts, thereby causing $1,004,662,911.57 worth of Iranian funds to be transferred by IBK's CBI Won Account to Zong's accounts, converted to USD, and transferred by IBK at Zong's direction to other accounts that Zong and his co-conspirators controlled and/or for the benefit of Zong and his co-conspirators, all in violation of U.S. sanctions laws (the "Zong Transactions").

### D.   DETECTION OF THE ZONG TRANSACTIONS

29.     While the first of the Zong Transactions was processed by IBKNY, in its capacity as a correspondent bank for IBK, on February 10, 2011, it was not until July 20, 2011, when the Compliance Officer, while conducting the type of manual review of transactions described

above, noticed and flagged a subset of the Zong Transactions as suspicious, based on their frequency and dollar amount.  In total, the Compliance Officer identified 20 transactions with a total value of approximately $10 million that had been originated by Zong through the CBI Won Account and that had ultimately passed through IBKNY.

30.     On July 20, 2011, the Compliance Officer requested supporting documents for the subset of Zong Transactions that had passed through IBKNY from the IBK branch in South Korea where Zong had maintained an account.  This documentation made clear that these USD transactions involved Iran, which the Compliance Officer immediately identified as unlawful. The Compliance Officer then reached out directly by phone to the Head Office employee responsible for the IBK division that oversaw the operation of the CBI Won Account.  The Compliance Officer conveyed that he had "no doubt IBKNY will be hit by OFAC with a violation," and added that the real problem lay not in New York but instead with operation of the CBI Won Account in Korea, and therefore had to be addressed "at Head Office."  The Compliance Officer further emphasized that "all of this problem [*sic*]could have been avoided if the wire transfers involving Iran (or any other OFAC sanction country) had not been routed through the New York Branch or any other USA Bank."  Unbeknownst to the Compliance Officer, IBK had already routed an additional $990 million of sanctions-violating Zong Transactions through other U.S. correspondent accounts.

31.     Subsequently, on August 29, 2011, the IBK Head Office suspended settlement of all intermediary trade – the type of transaction that Zong and his co-conspirators were purporting to conduct – through the CBI Won Account.  On August 22, 2011, IBKNY filed a SAR regarding the subset of Zong Transactions that had gone through IBKNY.  On August 26, 2011, IBKNY made a disclosure regarding the same transactions to OFAC.  However, IBKNY

disclosed only the roughly $10 million in prohibited transactions that had been routed through

IBKNY.  IBK never self-reported to OFAC its involvement in the remaining $990 million worth

of prohibited transactions, although, in January 2013, after the Seoul Central District

Prosecutor's Office publicly announced the indictment of Zong in connection with the Zong

Scheme, IBK provided the materials that had been released by the prosecutor's office to OFAC.

### E.  IBK CONTINUES TO FAIL TO IMPLEMENT AN ADEQUATE AML PROGRAM

32.     Shortly after the Compliance Officer flagged the Zong Transactions – and nearly

six months after they commenced – the Compliance Officer again alerted IBK's management to

the dire state of IBKNY's AML program.  On July 20, 2011, the Compliance Officer wrote a

memo to senior leadership at IBK's Head Office in which he noted that:

> [C]urrently the branch AML monitoring program is behind 8 monthly BSA
> reviews due to insufficient resources.  Branch management has refused to accept
> my repeated recommendation to increase resources . . . . Regulation H of the
> Federal Reserve mandates a branch have a BSA program that includes an
> effective BSA review process with sufficient resources to be able to detect and
> report suspicious activity within a reasonable time frame.  Under these
> requirements, the branch is deficient in both areas.

33.     Despite this harsh assessment (which was followed by a warning that a failure to

take immediate action "would have serious consequences for the branch and IBK"), IBKNY did

not take immediate steps to remedy these deficiencies.  While IBK initiated a process to select a

vendor to install an automated system in August 2011, the system did not become operational for

another 18 months.  Moreover, while the system commenced operation in January 2013, it was

not validated by IBKNY's external auditor until 2014.  Nor did IBKNY hire even a second, full-

time compliance employee until October 2014.

34.     In February 2016, IBK and IBKNY reached a written agreement with two of its

primary regulators, the Federal Reserve Bank of New York ("FRB-NY") and the New York

State Department of Financial Services ("DFS") (the "Written Agreement").  The Written

Agreement arose out of FRB-NY and DFS's examinations of IBKNY, which still "identified

deficiencies relating to the Branch's risk management and compliance with applicable federal

and state laws, rules, and regulations relating to anti-money laundering ("AML") compliance,

including the Bank Secrecy Act ("BSA")."  To correct these deficiencies, the Written Agreement

specifically required the development of an enhanced BSA/AML compliance program that

provided for "a system of internal controls reasonably designed to ensure compliance with the

BSA/AML Requirements," "controls to ensure compliance with all requirements relating to

correspondent accounts for foreign financial institutions" and the "allocation of adequate

resources for the BSA/AML compliance officer, including sufficient staffing levels."

35.     IBK and IBKNY currently remain subject to the Written Agreement, but, as

described below, have made significant efforts to remediate IBKNY's BSA/AML program.

## IBK'S REMEDIATION EFFORTS AND PROVISION OF INFORMATION TO THE GOVERMENT

36.     As noted above, IBK neither fully disclosed to OFAC the magnitude of the Zong

Transactions nor self-reported IBKNY's BSA violations.  In May 2014, after IBK was alerted to

investigations by the Office and the NYAG (collectively, the "Agencies"), it cooperated with

those investigations.  IBK made its employees available for interviews, signed tolling agreements

and extensions of those tolling agreements with the Office, and addressed questions posed by the

Agencies. With the assistance of a forensic accounting firm, IBK also conducted an extensive

internal review, including a review of transactions involving IBK's CBI Won Account from

September 2010, when the accounts were opened, until approximately December 2018.  IBK

also produced documentary materials to the Agencies, in response to a subpoena from the

NYAG and a Mutual Legal Assistance Request.  These productions, however, were of limited

assistance, because IBK failed to take steps to properly preserve relevant emails and documents at both IBKNY and the Head Office.  In August 2011, IBK issued a hold notice to IBKNY employees directing them not to delete emails; however, IBK did not alert the IT department to this notice until April 2013, which meant that approximately a year and a half worth of emails were automatically deleted from IBK's systems.  Similarly, IBK did not direct Head Office employees or the Head Office IT department to preserve emails until April 2013.  Further, the April 2013 preservation notice was ineffective; even once notified of the hold notice, the IT department failed to take the necessary steps to stop the automatic deletion of emails until August 2014.

37.    Since learning of the Agencies' investigations and entering into the Written Agreement, IBK has made significant efforts to remediate its BSA/AML program.  IBK has enhanced its governance structure and created two bodies to provide BSA/AML and sanctions compliance oversight: the U.S Regulatory Remediation Steering Committee, which is chaired by IBK's Deputy Chief Executive Officer and includes IBK's senior management team, and the New York Branch Compliance Committee, which reports to both the Steering Committee and Head Office management.  IBKNY has hired a new compliance officer, who now reports directly to IBK's Chief Compliance Officer, as well as a deputy compliance officer and nine additional compliance employees.  IBK has also implemented a new compliance testing program, developed methodologies and protocols for reporting, tracking, and assessing compliance issues, and reworked its transaction monitoring processes and systems.